UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CR-211-BO(1)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | GOVERNMENT'S |
| V. | ) | SENTENCING MEMORANDUM |
| | ) | |
| DAVID A. PASSARO | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby files this Sentencing Memorandum, and in support thereof, shows unto the Court the following:

## FACTUAL BACKGROUND

In June of 2003, Defendant David A. Passaro was an independent contractor working in Afghanistan on behalf of the United States Central Intelligence Agency ("CIA"). Defendant Passaro was engaged in paramilitary training activities in support of the United States military personnel at the Asadabad Base in the Kunar Province.

Asadabad Base is a forward operating base located in the northeastern corner of Afghanistan near the border with Pakistan. The base was subjected to rocket attacks; however few if any rockets actually impacted on the base during Defendant's brief time at the base.

Abdul Wali, a local Afghan farmer, was among a group of individuals who were suspected of the attacks. On June 18, 2003, Wali, hearing that he was implicated in the rocket attacks, presented himself to then Governor Said Akbar in attempt to clear

his name. Governor Akbar encouraged Wali to present himself to the Americans, answer their question and clear his name. As a sign of personal support for Wali, Governor Akbar sent his son Hyder Akbar to the American base.

Wali was met at the gate by Chief Warrant Officer Brian Halstead, Defendant Passaro and an interpreter. Wali was initially questioned with young Akbar acting as an interpreter. Passaro acted aggressively toward Wali, often yelling accusations and glaring at Wali in an apparent attempt to intimidate Wali. Due to the Defendant's openly hostile demeanor Akbar asked to be relieved of his interpreter duties and was replaced by a local Afghan contract interpreter. The Defendant requested Wali to be taken into custody and the session ended with the Defendant prophetically asking Wali if there were any personal effects he wished given to his family.[1]

Wali was detained in a small primitive holding cell on the base built during the Soviet era. The cell had one door and no windows and no meaningful ventilation system despite the average ambient temperatures in the region in excess of 100 degrees.

The first twenty-four hours of the Wali's detention were fairly unremarkable. He was guarded by elements of the 82nd

---

[1] Part of this encounter was videotaped by Sergeant Sellers, however taping stopped once Passaro pushed Wali against the wall. At trial Seller told the Court that he stopped taping for fear of another Rodney King incident, alluding to the infamous LAPD police brutality case.

2

Airborne Division assigned to the base. Although physically restrained with shackles and manacles, Wali was periodically permitted to sit, sleep and eat. He was questioned by Passaro's superior Steve and Sergeant Marty Dixon, during which time Wali consistently denied any involvement in the rocket attacks.

On June 19, 2003, Defendant Passaro took control of the questioning process. Passaro instructed the guards that he alone would be the source of food for Wali and to maintain Wali in a series of "stress positions" designed to weaken his resistance. Passaro further told the guards that while they could not strike Wali, he had different rules which permitted him to administer any force so long as it was not life-threatening.

Passaro returned to the cell block that evening and staged a fictitious beating in the cell adjacent to Wali's. During this time Passaro would scream at his imaginary subject, bang boards together presumably to simulate a beating, with his Afghan interpreter screaming in false agony. Passaro, the interpreter and the guards then entered Wali's cell. Wali was secured to the floor, his hands restrained and his head covered with a sandbag. Passaro then questioned Wali for approximately 45 minutes to an hour seeking a confession and locations of weapons caches. Wali again denied any knowledge or involvement in the attacks, each time being met with the striking of his hands, legs, knees and shins with a four cell maglite. The session ended with Passaro kicking

3

the unwitting Wali in the groin with his shod foot. The kick was with sufficient force to lift Wali off the ground. Passaro, deciding to take a break, stepped outside where the guards completed their shift change. Approximately ten minutes later they returned to the cell and resumed the process of placing Wali in stress positions, Passaro questioning and striking Wali with the maglite. This second session lasted approximately one hour and was ended when Passaro again administered a kick to Wali's groin which sent him crumbling to the floor in obvious pain. Throughout the two hour session, despite the application of physical coercion, Wali maintained his innocence.

On June 20, 2003, Wali expressed difficulty in urination and that night asked for the Defendant. The Defendant returned to the cell in an apparent intoxicated state and in possession of a partially consumed alcoholic beverage. Passaro questioned Wali for approximately one hour, hitting him this time with a high intensity spotting light.

On June 21, 2003, Wali, exhibiting the effects of his maltreatment, began acting disoriented and belligerent towards the guards. He entreated the guards to shoot him, and made an attempt to grab one guard's sidearm. The Defendant was summoned and administered first aid, which included kicking Wali's prostrate body. Wali was pronounced dead approximately twenty minutes later. Passaro was told by members of the military if the body was not claimed, it would be taken to Bagram Air Base for an autopsy. It

4

was at this time that the Defendant took it upon himself to contact the Governor's Office to arrange for disposal of the body. Defendant telephoned Hydar Akbar and warned him that the body would be autopsied if it was not claimed quickly. Wali's body was claimed by his family later that same afternoon and an autopsy was never performed.

On June 25, 2003, the CIA unilaterally removed Passaro from the Asadabad base and assigned him administrative duties. Two weeks later, Passaro was removed from Afghanistan. He was never again asked to perform any services on behalf of the CIA and his contract with them was eventually allowed to lapse.

On June 17, 2004, a grand jury sitting in the Eastern District of North Carolina returned a true bill of indictment charging the defendant with four counts of assault. Two counts charged the Defendant with Assault Resulting in Serious Bodily Injury, Title 18 U.S.C. 113(a)(6) and two counts of Assault With a Dangerous Weapon, Title 18 U.S.C. 113(a)(3).

Passaro was placed under arrest and was detained pending trial until August 27, 2004, when he was released on bond with pretrial supervision. On June 3, 2005, Passaro was arrested for a violation of the conditions of his release until released again on March 17, 2006. On April 5, 2006, Passaro was again returned to custody for another violation of his conditions of release and presently remains in custody.

On August 17, 2006, after an eight-day trial, Passaro was

5

found guilty of Count Two of the Indictment, Assault Resulting in Serious Bodily Injury, Title 18 U.S.C. 113(a)(6). The Defendant was also found guilty of a lesser included offense of Simple Assault of the remaining three counts.

### DEFENDANT'S SENTENCE

The Defendant should receive the maximum sentence permitted by law for his vicious and brutal assault of an unarmed, defenseless individual placed in his custody. Such a sentence would be consistent with the recommendation of the Probation Officer, who determined the applicable sentencing guideline range pursuant to the United States Sentencing Guidelines Manual to be 108 to 120 months imprisonment.[2] Pursuant to United States v. Booker, 543 U.S. 220 (2005), the sentencing guidelines are now advisory. However, the Fourth Circuit has held in United States v. Hughes, 401 F.3d 540 (4th Cir. 2005), that despite the guidelines not being mandatory the court should determine the "correct" guideline range and consider it prior to imposing sentence. This "correct" range is "presumptively reasonable" pursuant to United States v. Green, 436 F.3d 449 (4th Cir. 2006).

Even if the Court decides on a lesser guideline calculation and/or grants Defendant's request for a downward departure, the 120

---

[2] A sentence of 120 months would actually be in the middle of the theoretical range of 108 to 135 months the defendant merits under his guideline calculation. However, any sentence in excess of 120 months for Count 2 would be in violation of the 120 month statutory cap.

6

month sentence for Count 2 is still appropriate due to the fact that an upward departure is merited under U.S.S.G. 5K2.8 Extreme Conduct. 5K2.8 permits the Court to upwardly depart

> If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim . . . Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

The evidence at trial painted a picture of a chamber of horrors created and controlled by the Defendant. The guards testified that the defendant ordered Wali held in various stress positions, prohibited him from sleeping, restrained his hands and feet, sandbagged and beaten with a metal flashlight and kicked with sufficient force to lift him off the ground in a virtually unventilated space with ambient temperatures in excess of 100 degrees. One guard testified that Wali repeatedly moaned and muttered the Pashtu word "maligima" ("I'm dying"). Clearly, Defendant's behavior merits an upward departure under 5K2.8.

Furthermore, the Court may impose the maximum punishment even if it determines a guideline range and departures does not yield a range of 120 months. When calculating the appropriate sentence Title 18 U.S.C. Section 3553(a) directs the court to consider in addition to the Sentencing Guidelines calculation

> (1) the nature and circumstances of the offense and history and characteristics of the defendant . . . (3553(a)(1));
>
> (2) the need for the sentence imposed to afford adequate deterrence to criminal conduct (3553(a)(2)(B)); [and]

7

(3) the need for the sentence imposed to protect the public from further crimes of the defendant (3553(a)(2)(C))[.]

### *Nature and Circumstances of the Offense*

One would be hard pressed to imagine an assault fact pattern more disturbing than the one presently before the Court. At trial, the Government presented eyewitness testimony that Wali voluntarily presented himself to the U.S. authorities after hearing he was wanted for questioning regarding the rocket attacks. His village was actually closer to the Pakistani border than the Asadabad base. Knowing that he was wanted for questioning by the Americans, he could have easily fled to Pakistan and avoid any scrutiny whatsoever. Instead, he trusted Governor Akbar and the reputation of the Americans to be treated fairly. Unfortunately, due in large part to the Defendant, his trust was misplaced.

Wali was met at the gate, intimidated, threatened and taken into custody by none other than the Defendant. Over the next 72 hours he was held in custody, physically restrained and kept in various stress positions all at the behest of the Defendant. Unfortunately, this was not the worst circumstance he would face. After approximately 45-60 minutes of questioning by the Defendant and being beaten with a large metal flashlight while his vision was obscured with a sandbag over his head, the Defendant kicked Wali with shod foot with sufficient force to lift Wali off the ground. Wali crumpled to the ground writhing in pain. Wali would later

8

complain to the guards of abdominal pain and his inability to urinate. Expert testimony at trial described the likely severe damage to Wali's pelvic region consistent with the blow and symptomology exhibited by Wali. Wali died less than 48 hours later. These facts alone merit the maximum punishment.

In his sentencing memorandum Defendant once again reprises a common theme, Wali was a "terrorist" and he, the Defendant is a patriot (Def. Sent. Mem. at 12, 13, 14 and 15). Unfortunately, the Defendant has confused the concept of suspicion and verification. At trial, only evidence of suspicion of Wali's terrorist ties was presented. What the Court did hear was that the military had no interest in Wali and that the region has a history of unscrupulous individuals attempting to falsify information in an effort to have the United States unwittingly satisfy their disputes. Truth be known, it need not matter. Regardless of Wali's status, he was in United States custody, behind base walls, away from any battlefield in the process of being questioned.

Defendant's attempts at labeling himself a patriot or hero likewise fail. In his sentencing memorandum the Defendant retreats to one of the last refuges of the scoundrel, false patriotism. At trial, counsel for the Defendant repeatedly and inappropriately argued to the jury that the Defendant was in fact a hero. He attempts to continue this theme by submitting a number of records

9

from Defendant's military record.[3] While the Government vehemently disagrees with much of these conclusions and will discuss it more fully below, for purposes of this analysis, the Government directs the Court's attention to two items for determining the suitability of the Defendant for canonization. First, the acts themselves speak to the Defendant's ultimate character. The Defendant had the guards exhaust his prisoner for hours using stress positions, sleep deprivation and psychological tactics. He deprived him food and then assaulted a helpless, defenseless prisoner while the guards stood by in case his victim could somehow mount some type of counterattack. Second, a patriot or hero can best be identified for the sacrifice and actions he or she took for a noble cause. The Government directs the Court's attention to the letter of the then Governor of the Kunar Province, Said Fazel Akbar contained in Attachment A, to see what "noble cause" benefitted from Defendant's actions. In his letter, Governor Akbar described the difficult task of establishing trust and opening dialogue with the Afghan people who had been subjected to years of tyranny under the Soviets and Taliban. Governor Akbar tells the Court the devastating effect the death of Wali had on his efforts. He ends his letter with this haunting observation ". . . the only people to gain from Dave Passaro's actions were Al Qaeda and their partners." The Government

---

[3] It should be noted this is the very same military record the Defendant refused to allow the Probation Officer review when preparing for the sentencing hearing.

10

submits that this crime was not the work of a patriot.

***History and Characteristics of the Defendant***

The Court is encouraged to consider the history and characteristics of the defendant in addition to any guideline computation in determining an appropriate sentence. Here again, the Defendant presents no meaningful case for mitigation.

1.   **Defendant's 1991 Assault Conviction**

What is past is prologue. This is the not the first time the Defendant has been brought before the judicial system in connection with an assault. In 1990, while on probation with the Hartford Police Department, Passaro viciously attacked Edward Julian in relation to an unpaid debt. While the horrific injuries (See photo at Attachment B) to Mr. Julian speak to the brutality of the attack, it is the surrounding facts and circumstances that eerily foreshadow the charges he presently stands before this court to be sentenced upon.

Due to the nature of the Defendant's government service over much of the past decade, he has provided authorities various explanations of the 1990 assault. At one time or another the Defendant has claimed that his firing and charging were politically motivated, much like what the Defendant has argued through much of the pre-trial litigation in this case and statements made to the press. In the case of the Connecticut assault he explained to the Harnett County Sheriff when seeking a concealed weapons permit in 2002 that his 1990 firing and charging was somehow a reaction to

11

the police brutality inflicted upon Rodney King in Los Angeles, California. This mirrors his statements to the press and implications of counsel today that this prosecution is due to the infamous Abu Ghraib prison scandal. An examination of any calendar reveals Defendant's flawed logic.

Public records disclose that Defendant assaulted Mr. Julian in October 1990, this was five months *before* the Rodney King assault. In essence, the Defendant claims the King assault influenced his firing, before King was ever assaulted. This type of "logic" is remarkably similar to that presently presented to the Court and for public consumption through the media when the Defendant claims that he is a "scapegoat" for Abu Ghraib. Here, the Defendant committed his assault in June of 2003. CIA investigators were immediately dispatched and the Defendant was promptly removed from Asadabad and shipped home within two weeks. An examination of the charging documents from the Abu Ghraib prison scandal disclose criminal activity which occurred in the months of October and November 2003. This was several months *after* the defendant's assault and an international criminal investigation was well underway. Even if, as the Defendant may argue, that the indictment was not brought until July 2004, he is reminded that he was served a target letter on February 12, 2004, notifying him of the impending criminal charges. This was several months *prior* to any public knowledge of the scandal, which occurred at the earliest in the Spring of 2004, making it impossible under any analysis to classify this

12

prosecution as reactionary or political.

However, an examination of the Defendant's character should not be limited to his apparent ability to bend the time-space continuum. The 1990 assault case displays his proclivity to attempt to obstruct justice. In the hours following the 1990 assault, the Defendant returned home; woke his wife from a deep sleep; concocted a story of how she was with him throughout the night; presented himself to authorities using his wife as an alibi; had her file a false statement on his behalf; attempted to preemptively file charges on Julian, telling the officers that he, Passaro, despite being conscious and in possession of two non-fractured orbital lobes, unlike Mr. Julian, was as equally injured as Mr. Julian. Passaro then provided a written false statement of his own to the authorities in an attempt to avoid prosecution. According to all who were there to witness this surreal event, when his ill-conceived plan began to crumble around him, he recanted his previous statement, faked a seizure and retreated to the relative safety of a hospital.

Here, Mr. Passaro returned from Afghanistan, a knowing suspect in a death investigation. He conveniently affiliated himself with a well respected local church, who coincidently is the main source of character letters on his behalf despite being a mature man of 40 years; just so happened to find love online with a career law enforcement officer, who would later perjure herself at his urging in an effort to secure his pre-trial release; make false statements

13

to a Probation Officer concerning his finances and violate conditions of his pre-trial release on no less than two separate occasions.

**2. Defendant's False Statements to Employers**

In 2002, while in the midst of securing more lucrative employment as an independent contractor with the CIA, the Defendant shirked his duty to his National Guard unit which was preparing to deploy to Kosovo. He accomplished this by falsely claiming he could not accompany them since he was needed at home to care for his then infant son. This was patently false. From uncontested testimony at trial we know that at the very time he was claiming he was needed at home, the Defendant was in fact preparing to travel to Afghanistan for the CIA. This and several other of the Defendant's deceptions were documented in an Army AR 15-6 investigation report which justified his dismissal from his civil service employment with the Department of Defense. Other lies documented include multiple false statements made by the Defendant in an effort to receive his numerous security clearances.

**3. Defendant's Military Service and Service in Afghanistan**

Defendant asks the Court to consider the Defendant's military and CIA service in combat (Def. Sent. Mem at 12). The Government joins them in this request.

The Sentencing Guidelines make clear that military service is not ordinarily relevant for departure purposes (USSG 5H1.11). However, USSG 5K2.0(a)(4) permits consideration for exceptional

14

degree.

In support of his request, the Defendant provides to the Court numerous selected excerpts from his military record. The Government argues that is actually an aggravating factor. This extensive documentation of Defendant's training if nothing else, should have made clear to Defendant the limits of his training and authority. At best, the Defendant's military record, displays the level of accomplishment typical for a military member similarly trained who served on active duty in peace time *between* Operation Desert Storm and the present military conflict in Iraq and Afghanistan. What remains absent from his record is evidence of any exceptional service which would be evidenced by a Combat Medics or Infantryman's Badge or similar award or decoration. This is because Mr. Passaro did not serve in combat while in the Army. Furthermore, the Army AR 15-6 investigation which related to the eventual termination from his position with DOD ends all doubt regarding the true character of the Defendant's military service. It disclosed several false statements on his application for security clearances submitted during his time on active duty. While his service was otherwise commendable and terminated under honorable conditions it simply does not rise to the level envisioned by the guidelines.[4]

---

[4] Interestingly enough, the Defendant's National Guard Unit's deployment to Kosovo in 2003 would have posed a closer question, however, the Defendant avoided that mobilization by claiming family hardship, despite pursuing a contract position

15

This leaves his service on behalf of the CIA in Afghanistan in the Summer of 2003. Defendant argues that his service in Afghanistan should be considered (Def. Sent. Mem. at 14). In the approximate forty-five days that the Defendant actually spent in Afghanistan on behalf of the CIA he committed the crime he presently stands before this Court to be sentenced; opened fire upon his own men; and assaulted at least one other Afghani at a military checkpoint for the unforgivable transgression of failing to look his colleague in the eye when being questioned.

Defendant's prior military service and service in Afghanistan supports the sentence the Government recommends.

### 4.   Matthew Newman

Defendant's character is painfully illuminated for the Court in the  serial beating of his step-son Matthew Newman which ended in an uncontested court order removing him from the Passaro home and awarding custody to his father. Newman confirmed to FBI agents that Passaro repeatedly beat him from the age of 7 to 14, often with a metal flashlight, much like the one he used on Wali. He would often brag to Newman how any attempt to report the beating would be futile since he would administer the blows in a manner that would leave minimal marking and no one would take the word of a troubled young man over that of a active duty military member. This tragic story has been corroborated by Newman's father, sister

---

with the CIA.

16

and mother.

### *Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct*

A severe sentence is necessary to provide adequate general and personal deterrence. The Government disagrees with the Defendant in his characterization of the limited applicability of deterrence based on location (Def. Sent. Mem. at 14). Geographic location however is only one aspect to be considered. At its core, the case before this Court is one of detainee abuse. Whether it happened in Afghanistan or Apex, North Carolina, the message sent must be clear--no one is above the law and those entrusted to such duties must not use the vulnerable nature of their victims to justify their illegal actions.

Regarding personal deterrence, despite the claims that their client has "learned his lesson" (Def. Sent. Mem. at 14), there is absolutely no evidence of this. He has attempted to manipulate the system at every turn, beginning with his false statements to the Probation Officer, continuing through his fostering of perjury at his detention hearing and deceit during his pre-trial release.

Finally, an appropriate sentence would not "deter other patriots from volunteering." (Def. Sent. Mem. at 14). First, the Government begs to differ with the implication that the Defendant is in fact a Patriot. This is accepting the definition that a Patriot does not help Al Qaeda and its partners, as Governor Akbar characterized the Defendant's actions. Second, the Government is quite happy foregoing the services of any volunteer who would

17

appoint himself judge, jury and executioner of a detainee entrusted to his care.

### *The Need to Protect the Public from Further Crimes by the Defendant*

In the short time Defendant served as a CIA contractor, he managed to invigorate an entire resistance movement in one of the most violent, dangerous places on the planet. This was foreshadowed by the brutal assault of Mr. Julian when Defendant was still a junior police officer in a major metropolitan police force. The Government fears the "can do" spirit of the Defendant cited by his own counsel (Def. Sent. Mem. at 15) will permit him once again to wreak havoc on yet another unsuspecting community.

### CONCLUSION

Defendant should receive a sentence of 120 months for committing an assault resulting in serious bodily injury. This sentence is actually mid-range of the what the appropriate advisory guideline calculation would be. Even if the Court determines a lower guideline calculation in this case an upward departure is merited due to the extreme conduct of the Defendant. Finally, even if the Court fails to grant the upward departure, a sentence of 120 months is appropriate when considering the crime, character of the Defendant, deterrence value and safety of the community. Finally, the Government asks that the Defendant receive six months imprisonment for each of the three misdemeanors that he was convicted of, and that they run consecutively of any felony sentence.

18

Respectfully submitted, this 12th day of February, 2007.

GEORGE E. B. HOLDING
United States Attorney


_/s/ James A. Candelmo_
BY: JAMES A. CANDELMO
Assistant United States Attorney


_/s/ Michael P. Sullivan_
BY: MICHAEL PATRICK SULLIVAN
Special Assistant
United States Attorney

19

February 8, 2007

To the Honorable Terrence W. Boyle

Dear Judge Boyle,

During my time as governor of Kunar province, the death of Abdul Wali was the worst incident that I had to face. This death did tremendous damage to Afghanistan's national reconciliation efforts, the credibility of the American led coalition forces and the traditional trust that my family and I have had for generations in this region. As the governor of Kunar province, I put a lot of effort in trying to create dialogue with those that opposed the Afghan government and the American-led coalition forces. Through the use of local customs and traditions like talking to tribal and religious leaders, I wanted to encourage the opposition, and those accused of being a part of them, to join Afghanistan's reconstruction efforts and help in establishing peace and security in the country; in return for their cooperation I assured them that they will not suffer any ill-treatment and receive support from the Afghan government and aid from the Americans.

Till the death of Abdul Wali, this policy was very effective and produced results. Local opposition leaders who were on the American's wanted list began to contact us, some of them laying down their weapons and surrendering to the government – a man named Saleh Mohammad, a commander for an opposition party (led by Gulbadeen Hekmetyar) in Kunar, did exactly this and was released by the Americans after talking to them. In such an atmosphere of trust, Abdul Wali also contacted us through tribal leaders and insisted that he was innocent and would like to clear his name. Under the influence of anti-American propaganda started by Al Qaeda and the Taliban, Abdul Wali was fearful of the Americans and did not believe he would be treated fairly at the American base. I told him to talk to the Americans and assured him that, as long as he is honest, the Americans will appreciate his presence. To gain Abdul Wali's trust, I sent my own son, Said Hyder Akbar, to escort him to the American base.

Unfortunately, Abdul Wali died during the investigation and we were told by the Americans – especially Dave Passaro – that he was not mistreated during his time at the base, which has now been proved to be untrue. The news of this death spread quickly among the people and had a very negative impact on their perceptions of the Afghan government and the Americans. This incident was used as a propaganda tool by Al Qaeda and Taliban forces; it also created a huge setback for Afghanistan's national reconciliation efforts. Another man named Najmuddin, who was also wanted by the Americans and had been in contact with me, refused to cooperate after this incident. The distrust of the Americans increased, the security and reconstruction efforts of Afghanistan were dealt a blow, and the only people to gain from Dave Passaro's actions were Al Qaeda and their partners.

Sincerely

Said Fazel Akbar

Attachment A



C90-318873

Attachment B

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Government's Sentencing Memorandum served via Electronic Filing on this 12th day of February, 2007, to:

Joseph Gilbert
Assistant Federal Public Defender


/s/ James A. Candelmo
BY: JAMES A. CANDELMO
Assistant United States Attorney


/s/ Michael P. Sullivan
MICHAEL PATRICK SULLIVAN
Special Assistant
United States Attorney

Case 5:04-cr-00211-BO    Document 265    Filed 02/12/07    Page 22 of 22